UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MISTY STUBBLEFIELD,<br><br>Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, acting<br>Commissioner of Social Security,<br><br>Defendant. | No. 1:21-cv-01566-GSA<br><br>**OPINION & ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY**<br><br>**(Doc. 16, 17)** |

**I.    Introduction**

Plaintiff Misty Stubblefield ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is before the Court on the parties' briefs which were submitted without oral argument to the United States Magistrate Judge.[1]  Docs. 16, 17.  After reviewing the record the Court finds that substantial evidence and applicable law do not support the ALJ's decision.

**II.    Factual and Procedural Background[2]**

On April 1, 2020 Plaintiff applied for disability insurance benefits alleging a disability onset date of March 7, 2020.  The application was denied initially on June 11, 2020 and on reconsideration on July 20, 2020.  Plaintiff requested a hearing which was held before an Administrative Law Judge (the "ALJ") on January 5, 2021.  AR 35–51.  On March 8, 2021 the ALJ issued a decision denying Plaintiff's application.  AR 12–28.  The Appeals Council denied review on September 15, 2021.  AR 1–6.  On October 22, 2021 Plaintiff filed a complaint in this Court.

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge.  *See* Docs. 6 and 11.

[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, which will not be exhaustively summarized.  Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

### III. **The Disability Standard**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted). If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate non-disability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f). While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

**IV.     The ALJ's Decision**

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her amended alleged disability onset date of March 7, 2020. AR 18. At step two the ALJ found that Plaintiff had the following severe impairments: bilateral carpal tunnel syndrome; lateral epicondylitis; degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine with radiculopathy and neuropathy; and obesity. AR 18. At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 18.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. 416.967(a) with the following restrictions: after every 45 minutes of sitting stand for 2 minutes while remaining on task at her work station; occasionally climb ramps and stairs; occasional perform postural activities; frequently reach, handle, and finger. AR 18–22.

At step four the ALJ found that Plaintiff could perform her past relevant work as a collections clerk. AR 22. Accordingly, the ALJ found that Plaintiff was not disabled at any time since her amended alleged disability onset date of March 7, 2020. AR 22.

### V. Issues Presented

Plaintiff begins the brief with the following statement:

> The parties hereby submit this joint stipulation for resolution of the issues presented in this case pursuant to the Scheduling Order filed on the docket of the District Court on 4/1/2022

Br. at 1, Doc. 16.

The scheduling order issued on April 1, 2022 does not require the parties to submit a "joint stipulation for resolution of issues presented," nor does that requirement exist in any previous scheduling order issued in this case or other social security cases before this Court in which counsel has made the same introductory statement. Doc. 14. Although the Court previously required parties to exchange confidential letter briefs, the briefs were not to be shared with the Court, and that requirement was eliminated prior to the issuance of the scheduling order in this case. Most importantly, the document Plaintiff submitted is not a "joint stipulation for resolution of the issues presented." It is Plaintiff's motion for summary judgment.[3]

What the scheduling order does require, among other things, is a short and separate statement of each of Plaintiff's legal claims supported by factual and legal citations. Plaintiff does not clearly set forth distinct issues by way of a statement of issues presented, section headings, or any internal organizational structure. The Court will attempt to identify and address the points Plaintiff appears to be making.

### A. Listing 1.04

#### 1. Applicable Law

At step three of the sequential evaluation, Plaintiff has the burden to establish the existence of an impairment that meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1.

The Social Security Regulations "Listing of Impairments" is comprised of impairments to

---

[3] The motion contains a copied and pasted reproduction of counsel's letter to the Appeal's Counsel (*See* AR 153-58) to which Plaintiff adds the introductory language quoted above.

fifteen categories of body systems that are severe enough to preclude a person from performing gainful activity. *See Young v. Sullivan*, 911 F.2d 180, 183-84 (9th Cir. 1990); 20 C.F.R. § 404.1520(d). Conditions described in the listings are considered so severe that the presumption of disability cannot be rebutted. 20 C.F.R. § 404.1520(d). To meet a listing or satisfy medical equivalency of a listing, it is not sufficient for a claimant to have a diagnosis that matches the name of a listed diagnoses; all of the elements under the listing must be met. *See Key v. Heckler*, 754 F.2d 1545, 1549-50 (9th Cir. 1985).

## 2.      **Analysis**

Plaintiff questions the ALJs conclusion that Listing 1.04 (disorders of the spine) was not met. Plaintiff begins by block quoting[4] the ALJ's step three finding. With no transition, Plaintiff then offers a one paragraph summary of notes from Dr. Newton (the medical examiner in connection with her worker's compensation claim) concerning Plaintiff's radicular back pain, postural limitations, mobility limitations, exertional limitations, sensory abnormalities, gait abnormalities, muscle spasms, and positive nerve root tension signs. Br. at 4 (citing Ex. 10F p. 3, 8).

Plaintiff then contends that the listing[5] "may be met" because the listing discusses compromise of a nerve root, and Plaintiff's MRI report revealed moderate to severe left sided foraminal stenosis causing impingement at the exiting L5 nerve root.

A claimant will be found disabled under Listing 1.04 if s/he (1) has a disorder of the spine, such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [or] vertebral fracture," (2) which results in "compromise

---

[4] More accurately, Plaintiff appears to have taken a scanned copy of the ALJ's decision, captured a screenshot of the the relevant language, and copied and pasted the blurry image into the body of her brief, rather than highlighting the text from an electronic copy, or typing the language out manually.

[5] Plaintiff actually stated it was listing 2.04, but the relevant listing considered by the ALJ (disorders of the spine) is 1.04.

of a nerve root...or the spinal cord," *and* (3) is accompanied by the additional requirements set forth under subsections 1.04(A), 1.04(B), or 1.04(C). 20 C.F.R. 404, subpt. P, app. 1, § 1.04 (emphasis added).

All agree Plaintiff has a disorder of the spine, namely degenerative disc disease. Thus, she meets the first requirement. As for the second requirement, the ALJ found that the evidence of record does *not* establish compromise of a nerve root. AR 18. According to the regulations "Compromise of a nerve root, sometimes referred to as 'nerve root impingement,' is a phrase used when a physical object, such as a tumor, herniated disc, foreign body, or arthritic spur, is pushing on the nerve root as seen on imaging or during surgery." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. As the ALJ acknowledged at step four, the August 2020 lumbar spine MRI showed moderate to severe stenosis causing impingement of the L5 exiting nerve root. AR 904. Thus, it is not clear why the ALJ found that there was no evidence of nerve root compromise when it appears otherwise. See below.

In addition to a spinal disorder resulting in compromise of a nerve root, spinal cord or cauda equina, a claimant must also satisfy one of the three alternatives set forth in subsections 1.04(A), 1.04(B), and 1.04(C).

Subsection 1.04(A) requires:

Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Id. § 1.04(A). Subsection 1.04(B) requires:

Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours

Id. § 1.04(B). Subsection 1.04(C) requires:

>Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Id. § 1.04(C).

The ALJ found there was no evidence of spinal arachnoiditis as specified in 1.04(B), or lumbar spinal stenosis resulting in pseudoclaudication as specified in 1.04(C).  Plaintiff does not contend otherwise, and there do not appear to be any findings in the record that would substantiate spinal arachnoiditis which is defined as "'inflammation of the arachnoid membrane,' a membrane that surrounds spinal cord nerves, 'often without involvement of the subjacent subarachnoid space.'" *Smith v. Colvin*, 2015 WL 248281, at *4 n.3 (C.D. Cal., Jan. 20, 2015) (quoting Stedman's Medical Dictionary arachnoid, arachnoiditis (27th ed. 2000)).

With respect to 1.04(C), Plaintiff's MRI did show lumbar spinal stenosis, but there do not appear to be any clinical findings in the record to substantiate pseudoclaudication, associated weakness, or inability to ambulate effectively as required by 1.04(C).  Plaintiff contends that Dr. Newton's examination "documents" a variety of deficiencies including "walking with a limp."  Br. at 4 (citing AR 891).  That is incorrect. The cited section of Dr. Newton's report did not "document" anything objectively.  Rather, that section reflects "PRESENT COMPLAINTS (as reported by the applicant to the historian)."  AR 890 (emphasis in original).  Later in his report, Dr. Newton did objectively document various examination findings related to gait, but all were normal save for the claimant's complaint of heel pain when walking on heels.  AR 895.

Neither Plaintiff nor the ALJ addressed subsection 1.04(A) and it's requirements of 1) neuro-anatomic distribution of pain, 2) limitation of motion of the spine, 3) motor loss (atrophy with associated muscle weakness or muscle weakness), 4) accompanied by sensory or reflex loss and, 5) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).   Plaintiff did offer a scattershot recitation of findings purportedly "documented" by Dr.

7

Newton such as numbness and weakness, though Plaintiff did not make any connection between those findings and Listing 1.04(A). Moreover, numbness and weakness were not objectively documented. As discussed above, Plaintiff relies on the portion of Dr. Newton's report that merely documented Plaintiff's subjective, self-reported history to the historian. AR 890. In contrast, the notes from Dr. Newton's objective examination reflects full motor strength throughout, normal sensation, and normal reflexes. AR 899–900. Thus, the examination findings do not satisfy 1.04(A).

In sum, the ALJ erred at step three in finding no nerve root compromise despite acknowledging at step four that an MRI showed L5 nerve root impingement caused by moderate to severe foraminal stenosis. The ALJ further erred in failing to discuss subsection 1.04(A). These two errors, together with the analysis at step three, suggest the ALJ gave insufficient consideration to the requirements of listing 1.04 and how these would apply in this case.

Claimants' frequently assert that they meet Listing 1.04 based on common MRI findings of disc degeneration, bulging discs, stenosis, or similar finding, which are nearly unavoidable with age.[6] As courts have observed, these findings do not satisfy the threshold requirement of nerve root compromise. *See, e.g.*, *McKenzie v. Commissioner of Social Security*, 2020 WL 916872, at *4 (E.D. Cal., 2020) (finding no "nerve root compromise" as required by listing 1.04 where the MRI results showed only spinal stenosis and compression of the fat surrounding the nerve root, but no compression or impingement of the nerve root itself); *Schrader v. Colvin*, 2015 WL 1061681, at *8 (C.D. Cal., 2015) (finding no nerve root compromise where MRI report described narrowing of the disc space but no compression on the nerve root itself).

---

[6] The incidence of lumbar degenerative disc disease in the general population is 30% by age 35 and 90% by age 60. https://www.neurosurgery.columbia.edu/patient-care/conditions/degenerative-disc-disease
Sciatica is also quite common, with a lifetime incidence as high as 40%.
https://www.health.harvard.edu/pain/sciatica-of-all-the-nerve

However, MRI results in these types of cases can specify that a nerve root is in fact impinged or compressed, and here the ALJ was incorrect in concluding otherwise. *See, e.g. Kallenbach v. Berryhill*, 766 F. App'x 518 (9th Cir. 2019) (finding the ALJ erred in finding no nerve root compromise where MRI results did specify nerve root impingement, but the error was nonetheless harmless because there was no evidence of associated motor loss, reflex loss, sensory loss, and positive straight leg raise as required by 1.04(A)).

If the ALJ's assumption was that there is some underlying severity requirement for the impingement or compression to constitute a nerve root compromise, this assumption runs contrary to the plain language of the regulation:

> Compromise of a nerve root, sometimes referred to as 'nerve root impingement,' is a phrase used when a physical object, such as a tumor, herniated disc, foreign body, or arthritic spur, is pushing on the nerve root as seen on imaging or during surgery. It can occur when a musculoskeletal disorder produces *irritation, inflammation, or compression* of the nerve root(s) as it exits the skeletal spine between the vertebrae. Related symptoms must be associated with, or follow the path of, the affected nerve root(s).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added).

Thus, "Compromise" is described in such unremarkable terms (including irritation, inflammation*,* or compression) that it suggests the threshold is quite low. What makes Listing 1.04 difficult to meet is that the compromise of the nerve root, cauda equina, or spinal cord must *manifest* rather profoundly, as in one of the three manners specified in subsections (A) through (C), which would not happen in the absence of severe compromise of a nerve root, cauda equina, or spinal cord. Hence an ALJ errs when too quickly finding the threshold requirement of nerve root compromise is not met, dispensing with the step three analysis and, in so doing, excusing the obligation of analyzing the dense technical requirements of subsections (A) through (C), which often require a detailed read through progress notes and physical examinations. Those subsections are the real driving force behind listing 1.04.

Notwithstanding, there is no basis here to find the ALJ's errors harmful given: 1) Plaintiff fails to address the requirements of any of the three subsections quoted above, and 2) the only examination Plaintiff cites (Dr. Newton's September 28, 2020 examination) does not contain findings that satisfy any of the three subsections (despite Plaintiff's unverified reported symptoms of weakness and gait disturbance to the historian), and 3) there do not appear to be any examination findings in the record that would satisfy any of the three subsections, though the Court has no obligation to scour the record in search of the same where Plaintiff made no attempt to do so.

Plaintiff did not identify the two errors in the ALJ's step three analysis, did not attempt to identify any errors in the ALJ's step three analysis, and does not appear confident in the proposition that listing 1.04 was in fact met when Plaintiff merely asserts that it "may" have been met given the existence of nerve root compromise (which, again, is a fairly unremarkable threshold finding that does not satisfy listing 1.04 unless one of the three subsections quoted above is met).[7]

    **B.**    **Dr. Newton's Opinion**

        **1.**    **Applicable Law**

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2

---

[7] Intermixed with Plaintiff's discussion of Dr. Newton's examination and opinion, and listing 1.04, Plaintiff offered various discussion about the ALJ's duty to identify clear and convincing reasons before rejecting a claimant's testimony. The discussion is a bit disjointed because counsel appears to have copied and pasted the paragraphs and pages from his Appeal's Council letter in the wrong order (the letter he repurposed for use as his motion for summary judgment). In any event, the discussion does not identify 1) what specific pieces of testimony should have been credited as true, 2) what physical or mental restrictions would result, 3) how those restrictions would differ from those identified in the RFC, 4) what reasoning the ALJ offered on the subject, or 5) why that reasoning was deficient. The discussion does not get to the type of analysis that is required to meet Plaintiff's burden of identifying harmful error with respect to the ALJ's handling of her subjective statements. Granted, the ALJ did offer a boilerplate conclusion when stating that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." But this is the same verbatim boilerplate finding set forth in virtually every ALJ decision, and simply describing it as such is not a compelling or novel strategy, nor does it excuse Plaintiff from acknowledging and discussing the remainder of the ALJ's decision. *See Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review") (citation omitted).

(C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."  *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *Robbins,* 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings."  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).  The RFC need not mirror a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence.  *See* 20 C.F.R. §§ 404.1545(a)(3).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, when evaluating

any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.*

On April 22, 2022, the Ninth Circuit addressed whether the specific and legitimate reasoning standard is consistent with the revised regulations, and clarified what explanatory obligations still remain:

> The revised social security regulations are clearly irreconcilable with our caselaw according to special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. See 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ..., including those from your medical sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, see Murray, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.
>
> . . .
> Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence. The agency must "articulate ... how persuasive" it finds "all of the medical opinions" from each doctor or other source, 20 C.F.R. § 404.1520c(b), and "explain how [it] considered the supportability and consistency factors" in reaching these findings, id. § 404.1520c(b)(2).

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

### 2. **Analysis**

On September 28, 2020, Dr. Newton performed a "qualified medical re-evaluation" of the Plaintiff in connection with a workers' compensation claim. AR 889–912. Plaintiff emphasizes Dr. Newton's opinion that Plaintiff had the following limitations due to impairments of the cervical spine, lumbar spine, bilateral elbows, and bilateral wrists: lift 10 lbs; no prolonged overhead work; no repetitive forceful gripping or grasping; 10 minutes rest for every 50 minutes of typing or writing (but she can keyboard, grasp, push and pull 4 to 6 hours in an eight hour day); no repetitive bending,

twisting, squatting or turning (but she can forward bend and twist 1-2 hours a day); she should work at an ergonomically designed workstation; she had no restrictions on standing, walking, sitting, or climbing.  AR 910.

The ALJ offered the following discussion of the state agency opinions, followed by Dr. Newton's opinion:

> The opinions of the state agency physical consultants are less persuasive. In May and July 2020, the state agency physical consultants determined that the claimant can lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds; can stand, sit or walk for six hours in an eight-hour workday; and, can frequently reach overhead, and frequently handle and finger. (1A/6-8; 3A/6-8) These opinions are not consistent with the claimant's latest imaging of her back impairment: In August 2020, imaging of the lumbar spine showed advanced neural foraminal narrowing and disc osteophyte complex causing impingement of the existing nerve root. (10F/16) Electro-diagnostic studies of the lower extremities demonstrated mild innervated denervation. (10F/15) These diagnostic studies show that the claimant has a more restrictive residual functional capacity.
>
> On the other hand, the opinions of Dr. Peter Newton *are persuasive*. In July and September 2020, Dr. Peter Newton limited the claimant from lifting more than ten pounds, with no repetitive forceful gripping, and resting ten minutes, for every 50 minutes of typing. (10F/22; 9F/23) The claimant was further limited to no repetitive bending, stooping, twisting, squatting or turning. Id. The claimant had no restrictions on standing, walking, sitting, and climbing, but she had restrictions on forward bending, twisting, keyboarding, grasping and pushing or pulling. (10F/23) Limiting the claimant to a less-than-sedentary range of work is supported by the record of the claimant's diagnostic study showing severe median nerve neuropathy in September 2019. (10F/16) It is consistent with the record that the claimant has reached maximum medical improvement. (10F/17).

AR 21 (emphasis added).

Despite purporting to find Dr. Newton's opinion persuasive and reciting the restrictions identified therein, the ALJ did not include many of those restrictions in the RFC.  The ALJ formulated an RFC which restricted Plaintiff to: sedentary work; after every 45 minutes of sitting stand for 2 minutes while remaining on task at her work station; occasionally climb ramps and stairs; occasional perform postural activities; frequently reach, handle, and finger.  AR 18–22.

The ALJ adopted the state agency physicians' opinions as to frequent reaching, handling,

and fingering (despite finding those opinions less persuasive) and was more restrictive in the remaining respects, restricting Plaintiff to the sedentary exertional level rather than light.

The ALJ adopted Dr. Newton's opinion regarding 10 pound lifting capacity (the most required by sedentary work), and was even more restrictive than Dr. Newton's opinion with respect to standing and walking.  Further, the ALJ partially but not entirely, embraced Dr. Newton's articulated restrictions regarding postural activities, finding Plaintiff could perform all postural activities occasionally (defined as up to 1/3 of an 8-hour day), whereas Dr. Newton restricted forward bending and twisting to 1-2 hours (which is not quite 1/3 of an 8-hour day).  The ALJ assessed no more than frequent handling, reaching, and fingering (i.e. up to 2/3 of an 8-hour day, which would fall within the 4-6 hour window that Dr. Newton opined Plaintiff could perform the related activities of keyboarding and grasping).

The ALJ did not, however, adopt Dr. Newton's identified prohibitions on repetitive postural activities and repetitive forceful gripping/grasping, or the restriction concerning a 10 minute break for every 50 minutes of typing, opting instead for a 2 minute break after every 45 minutes of sitting but while remaining on task at her work station.

Dr. Newton's worker's compensation evaluation was quite lengthy and detailed and addressed matters not often addressed by the RFC questionnaires submitted in the social security context.  However, an ALJ "may not disregard a physician's medical opinion simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in the terminology used in such proceedings." *Booth v. Barnhart*, 181 F. Supp. 2d 1099, 1103 (C.D. Cal. 2002).  Rather, the ALJ must evaluate workers' compensation opinions just as he or she would evaluate any other medical opinion and must "translate" workers' compensation terminology into Social Security terminology to accurately assess the implications of those opinions for the Social Security disability determination.  *Id.*;  *Soria v. Berryhill*, No. 1:18-CV-00089-SKO, 2019 WL

2448435, at *11 (E.D. Cal. June 12, 2019); *Herlinda C. v. Saul*, No. CV 19-2730 AGR, 2020 WL 6287716, at *4 (C.D. Cal. Oct. 27, 2020).

Although the ALJ did not overtly reject Dr. Newton's opinion (and did acknowledge and incorporate some of the restrictions identified therein), the ALJ omitted the remainder without discussion. It is not reasonable to expect the ALJ to capture every subtlety and nuance in the opinion. Nor must the ALJ attempt to give meaning to vague restrictions such as the prohibition on "prolonged overhead work." But the 10 minute break for every 50 minutes of typing is concrete and there is no reason to conclude that it is not readily transferable to the RFC.

Defendant emphasizes that the RFC is not a medical opinion but an administrative finding reserved the commissioner, one which need not mirror any opinion. *See* 20 C.F.R. §404.1545(a). Defendant also argues that Plaintiff relies "on a highly cherry-picked view of Dr. Newton's opinion" in underscoring the restrictions he identified while ignoring his conclusion that she could return to work with an ergonomic work station and had no restrictions on standing, walking or sitting. Further, Defendant emphasizes that the ALJ assessed an RFC more restrictive than the medical opinions in several respects.

The fact that the ALJ included in the RFC some restrictions more stringent than Dr. Newton's (such as sitting, standing, and walking duration) does not necessarily justify the exclusion of other restrictions if those restrictions were independently justified. Additionally, Dr. Newton's conclusion that she could return to work with the restrictions he identified[8] is irrelevant if the ALJ

---

[8] The ultimate conclusion that Plaintiff could return to work is an example of the type of finding in the workers' compensation context that likely cannot be mechanically applied in the social security context. It appears to be predicated at least in part on wholly unique considerations such as the "computerized assessment of the applicant's total whole body impairment" broken down in percentages by body part, and the allocation of the claimant's impairments based on what caused those impairments (such as the lumbar spine impairment caused 50% by "obesity-appropriate degenerative changes and normal activities of daily living" and 50% by work trauma). AR 906. Had Dr. Newton's Qualified Medical Re-Evaluation ultimately concluded that Plaintiff could *not* return to her work, the Commissioner would assuredly contend (and has contended in the past) that the conclusion is inapplicable because disability under workers' compensation law is determined using an entirely different standard.

erroneously excluded those restrictions. Further, the fact that the ALJ stated the opinion was persuasive and mirrored it in some (or even most) respects does not permit the rejection of other restrictions without comment.

Here, the ALJ notably found Dr. Newton's opinion persuasive and found the opinions of the state agency physicians less so (without identifying any exceptions). The ALJ made that finding particularly in light of Plaintiff's "severe median nerve neuropathy" and her spinal pathology, conditions which could just as easily justify including additional restrictions Dr. Newton identified. This may suggest that the ALJ's intention was to incorporate those restrictions into the RFC, yet the ALJ did not entirely do so.

Hair splitting, perhaps, and this may not have impacted the conclusion that Plaintiff could perform her past relevant work. For example, the distinction between Dr. Newton's restriction of 1-2 hours of forward bending, versus the ALJ's restriction of all postural activities to "occasional" which strictly construed means up to 1/3 of an 8-hour day, or 2.67 hours.[9] However, Dr. Newton identified restrictions that were potentially outcome determinative such as the restriction of a 10-minute break every 50 minutes of keyboarding versus the ALJ's restriction of a 2-minute break every 45 minutes of sitting but while remaining at her workstation and remaining on task. These are quite different restrictions. Dr. Newton's restriction accommodates her carpal tunnel syndrome and associated median nerve neuropathy, whereas the ALJ's does not. Given the importance of the capacities of handling and fingering in sedentary occupations[10] (and the ALJ's own emphasis of "severe median nerve neuropathy" as one of the two specific reasons for rejecting the state agency opinions and crediting Dr. Newton's), the ALJ ought to have clarified her intentions and reasoning

---

[9] But SSR 83-10 states that occasional means "from very little up to 1/3 of the time," and later states that it equates to "about 2 hours of an eight hour work day."

[10] *See* SSR 96-9 ("Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base" . . . "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.").

vis-à-vis Dr. Newton's identified restriction because the ALJ did not ultimately encapsulate that restriction.

Dr. Newton's detailed findings and associated opinions were specially tailored to each of her body parts and associated impairments (such as carpal tunnel and associated median nerve neuropathy). Those findings and opinions were uniquely relevant as to what extent and under what precise set of circumstances she could return to her past relevant work as a collections clerk for Kern county. The non-disability finding here was predicated on a finding that Plaintiff could return to that specific job. Thus, where a physician has already given tremendous attention to that precise issue, the restrictions identified in his opinion ought to have been addressed more thoroughly.

## VI. Conclusion and Remand for Further Proceedings

In conclusion, at a minimum the ALJ ought to have identified the difference between Dr. Newton's opinion and the ultimate RFC, and clarified whether the intention was to include or exclude the restrictions therein and why (including repetitive postural activities, no repetitive forceful gripping, grasping; and 10 minutes rest for every 50 minutes of typing or writing), or posed those restrictions to the VE in one of the ALJ's alternative hypotheticals to ascertain whether their inclusion would have affected Plaintiff's ability to perform her past work as a collections clerk. Remand is thus appropriate for the ALJ to do so. *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

## VII. Order

For the reasons stated above, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled. Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is granted. The Clerk of

Court is directed to enter judgment in favor of Plaintiff Misty Stubblefield and against Defendant Kilolo Kijakazi, acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **February 21, 2023**                     **/s/ Gary S. Austin**
                                                                 UNITED STATES MAGISTRATE JUDGE